UNITED STATES DISTRICT COURT

Northern District of California

| | |
|---|---|
| GABRIEL GARCIA,<br><br>         Petitioner,<br>  v.<br><br>UNITED STATES OF AMERICA,<br><br>         Respondent.<br>_____/ | No. CR 97-022 MEJ<br><br>**ORDER DENYING PETITION FOR WRIT OF ERROR CORAM NOBIS** |

## I. INTRODUCTION

Before the Court is Petitioner Gabriel Garcia's Petition for Writ of Error Coram Nobis, filed on February 7, 2012. Dkt. No. 14. After considering the parties' papers and for the reasons explained below, the Court DENIES the petition.

## II. BACKGROUND

Petitioner Gabriel Leyva Garcia filed this writ of error coram nobis seeking to vacate his 1997 criminal conviction based upon a claim of ineffective assistance of counsel. Garcia pleaded guilty and was convicted for violating 18 U.S.C. § 1028(a)(4), "knowingly possessing a . . . false identification document with the intent such document . . . be used to defraud the United States."

Garcia is a 39 year-old El Salvadorian citizen and national. (Pet. at 3, Dkt. No. 14.) In 1992, he entered the United States without inspection. *Id.* On November 30, 1996, he married a United States citizen, Delmy A. Garcia, and they now have three children, ages 10, 12, and 15. All three children are United States citizens. (Garcia Decl. at 1, Dkt. No. 14.) Garcia is currently on

Temporary Protected Status and is authorized to work in the United States. *Id.* at 2.

On October 24, 1996, Garcia filed a United States passport application supported by a Puerto Rican birth certificate with the name Gabriel Leiba Mendez and a birth date of March 7, 1971. (Vancio Aff. ¶ 4a, attached to Compl., Dkt. No. 1.) Additionally, he submitted a California Driver's License bearing the same name as collateral proof of identity. *Id.* at ¶ 4c. However, on January 10, 1997, the Fraud Department at the San Francisco Passport Office informed United States Department of State Special Agent William Vancio that the Bureau of Vital Statistics in San Jose, Puerto Rico had no birth record of a Gabriel Leiba Mendez, born March 7, 1971. *Id.* at ¶ 6.

That same day, Garcia was arrested at the San Francisco Passport Agency for violation of 18 U.S.C. § 1542; False statement in application and use of passport. *Id.* at ¶ 7. Section 1542 carries a penalty of ten years imprisonment and a $250,000 fine. 18 U.S.C. § 1542 (1996). Garcia was then advised of his Miranda Rights in Spanish, which he acknowledged. (Vancio Aff. ¶ 7, Dkt. No. 1.) He did not sign a waiver of his rights; however, after invoking those rights, he voluntarily provided "that his true name [was] Gabriel Leyva Garcia, born in San Vicente, San Salvador, and that he [was] not a U.S. citizen." *Id.* Garcia "continued that he entered the United States near San Diego, California without inspection" in 1992. *Id.* Finally, Garcia "indicated that he ha[d] been working in the United States since that time, and that he ha[d] not had cause to depart the United States in the preceding five years." *Id.*

On January 30, 1997, pursuant to a signed plea agreement, Garcia pleaded guilty before this Court to a one count information charging him with violation of Title 18, U.S.C. § 1028(a)(4). (Information, Dkt. No. 5.) On May 1, 1997, the Court sentenced Garcia to one year probation, 50 hours of community service, and ordered him to pay a special assessment of $25. (Dkt No. 11.)

As a collateral consequence of his conviction, Garcia was permanently barred from gaining permanent residence status in the United States. 8 U.S.C. § 1182(a)(6)(C)(ii). When he pleaded guilty, it is undisputed that Hilary Fox, Garcia's federal public defender, did not advise him of the immigration consequences of his guilty plea. (Opp'n, at 2, Dkt. No. 19.) However, in 1997, the Sixth Amendment Right to Counsel did not require counsel to inform Mr. Garcia of those collateral

consequences. (Garcia Decl. ¶ 7, Dkt. No. 14.)

On November 4, 2008, Garcia's wife filed a relative visa petition for her husband, which was approved. *Id.* Garcia did nothing further with his visa petition, and he now claims that he did not learn of his inadmissibility until the "Fall of 2010," when his immigration attorney at the time informed him.[1] *Id.* In March of that year, the United States Supreme Court decided *Padilla v. Kentucky*, a case that changed the scope of the Sixth Amendment Right to Counsel. — U.S. —, 130 S.Ct. 1473, (2010). Specifically, *Padilla* now requires defense counsel to inform the defendant of certain adverse immigration consequences of a conviction. *Id.* at 1487.

"[A]t the end of 2010," Garcia's old immigration attorney referred Garcia to his current counsel, Stephen Shaiken, who deals specifically with "immigration consequences of criminal convictions." (Shaiken Decl. ¶ 3, Dkt. No. 14.) Shaiken states that,

> Petitioner was referred to [him] because [his] practice is . . . split evenly between criminal defense and immigration law, with a large percentage of [his] cases involving the immigration consequences of criminal convictions. [He] give[s] an annual lecture on immigration consequences of criminal convictions to the criminal conflicts panel lawyers in Marin County and ha[s] been designated an expert by state and federal courts on the subject. [He] edited a chapter on immigration consequences of criminal convictions for Ed Kuwach's treatise on driving under the influence.

*Id.* at ¶ 5. In the roughly 15 months that followed, Shaiken states that he prepared Garcia's case; specifically, he obtained Garcia's "old criminal file, petitioner's immigration file, interview[ed] petitioner and his immigration lawyer, and research[ed] the controlling law." (Pet'r Reply at 3, Dkt. No. 20.)

On February 7, 2012, Garcia filed the current petition for writ of error coram nobis seeking to vacate his 1997 conviction. (Dkt. No. 14.) On April 26, 2012, the government filed an opposition, (Dkt. No. 19), and Garcia filed a reply on May 17, 2012 (Dkt. No. 20).

### III. LEGAL STANDARD

The writ of coram nobis is an extraordinary remedy that allows a petitioner to attack an

---

[1] None of the documents provided to the Court state the name of Garcia's former immigration attorney.

3

unconstitutional or unlawful conviction after the petitioner has served his sentence and is no longer in custody. *United States v. Morgan*, 346 U.S. 502, 511 (1954); *Estate of McKinney v. United States*, 71 F.3d 779, 781 (9th Cir. 1995). "The writ provides a remedy for those suffering from the lingering collateral consequences of an unconstitutional or unlawful conviction based on errors of facts and egregious legal errors." *United States v. Walgren*, 885 F.2d 1417, 1420 (9th Cir. 1989) (internal citations and quotations omitted). To qualify for coram nobis relief, a petitioner must establish that: (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction to satisfy the case and controversy requirement of Article III; and (4) the error suffered is of the most fundamental character. *United States v. Kwan*, 407 F.3d 1005, 1011 (9th Cir. 2005) (abrogated on other grounds by *Padilla v. Kentucky*, — U.S. —, 130 S.Ct. 1473, (2010)).

## IV. DISCUSSION

The government does not contest that Garcia satsifies the first and third elements of the test for coram nobis relief. Instead, the dispute between the parties centers on the second and fourth prongs of the analysis: whether Garcia has valid reasons for not attacking the conviction earlier, and whether the error Garcia suffered is of the most fundamental character.

In his petition, Garcia contends that he is entitled to coram nobis relief because his Sixth Amendment rights were violated. (Pet. at 11, Dkt. No. 14.) Specifically, Garcia argues that the failure of his counsel to advise him of the adverse immigration consequences of his conviction when he pleaded guilty constitutes ineffective assistance of counsel. *Id.* Additionally, Garcia argues that valid reasons exist for not attacking the conviction earlier because Shaiken needed time to prepare his case, and the Government can not show that this delay caused prejudice. *Id.* at 13. Finally, he contends that the error suffered is of the most fundamental character because, had he been advised of the adverse immigration consequences, he would not have accepted the plea bargain and would have either bargained for a better plea or gone to trial. *Id.* at 11.

In its opposition, the Government argues that Garcia is not entitled to relief because his delay was unreasonable and he has not suffered fundamental error. First, the Government claims that

Garcia has given no reason for his substantial delay from 1997 to 2010 (pre-*Padilla*), and from 2010 to 2012 (post-*Padilla*). (Opp'n, at 11, Dkt. No. 19.) Second, the Government contends that Garcia has not suffered fundamental error because he failed to establish prejudice. *Id.* at 12. Particularly, the Government contends that Garcia's plea deal was favorable because it dropped his charge from a felony to a misdemeanor. Further, the Government argues that the evidence against Garcia was overwhelming; thus even if his counsel would have advised him of the immigration consequences of a guilty plea, Garcia still would have decided against going to trial. *Id.*

**A.      Whether Garcia has Demonstrated a Valid Reason for Delay**

In his petition, Garcia offers the following three arguments as to why his delay was valid: (1) he had no grounds to attack his conviction until 2010 because "until *Padilla* was decided, [Garcia had] no legal basis for a petition"; (2) subsequent to 2010, Shaiken needed time to prepare his case; and (3) Shaiken needed to pay close attention to "the trends in the application of *Padilla*," because federal circuits were split as to the retroactivity of the change in law. (Reply at 2-3, Dkt. No. 20.) Regarding the time needed to prepare his case, Garcia claims that Shaiken needed to gather his criminal and immigration files and interview both Garcia and his old immigration attorney. *Id.* Without explanation, Garcia assures the Court that "the time was put to good use." *Id.* at 3. Alternatively, even if the reason for delay was not valid, Garcia claims that the burden shifts to the Government to prove that the delay caused prejudice, which he argues it has failed to do. *Id.*

In response, the Government argues that Garcia has not met his burden because he has not given any valid reasons for the delay. (Opp'n at 4, Dkt. No. 19.) Specifically, the Government argues that none of Garcia's arguments are compelling, including the 13-year delay between Garcia's conviction and when he claims he learned of *Padilla*, the subsequent 21-month delay in filing his petition, and the five-month delay between when Garcia signed his declaration and when he filed his petition. (Opp'n at 2, 3, Dkt. No. 22.) However, the Government reaches this conclusion without explaining why Garcia's justifications are inadequate. Finally, the Government contends that Garcia's burden-shifting argument fails because it has not alleged prejudice and the need to prove prejudice arises only if it is first alleged by the respondent. (Opp'n at 4, Dkt. No. 19.)

Generally, filing a writ of error coram nobis is not time barred by any statute of limitations. *Telink Inc. v. United States*, 24 F.3d 42, 45 (9th Cir. 1994). However, courts have required coram nobis petitioners to provide valid or "sound reasons" for any delay after learning of the adverse effects of a conviction because coram nobis is an "extraordinary remedy that should be granted only under circumstances compelling such action to achieve justice." *United States v. Riedl*, 496 F.3d 1003, 1005 (9th Cir. 2007), *see also Kwan*, 407 F.3d at 1012. Courts have found valid reasons for delay when the "applicable law was recently changed and made retroactive, when new evidence was discovered that the petitioner could not reasonably have located earlier, and when the petitioner was improperly advised by counsel not to pursue habeas relief." *Riedl*, 496 F.3d at 1007, (internal citations omitted). While the petitioner is not required to file his writ at the "earliest opportunity," any delay in filing is unreasonable where "the petitioner has delayed for no reason whatsoever, where the respondent demonstrates prejudice, or where the petitioner appears to be abusing the writ." *Kwan*, 407 F.3d at 1013, 1014.

Here, as to the period from 1997 to 2010, Garcia argues that his delay was valid because the applicable law was only recently changed and made retroactive when *Padilla* expanded the scope of defense counsel's duty to provide effective assistance of counsel within the Sixth Amendment. "The Sixth Amendment guarantees adequate assistance of counsel in defending against a pending criminal prosecution," which includes assistance during plea negotiations. *Padilla*, 130 S.Ct. at 1494 (Scalia, J., dissenting). Prior to *Padilla*, effective assistance of counsel did not include defense counsel's duty to advise her client of any immigration consequences of a criminal conviction. However, after *Padilla*, defense counsel must advise a "noncitizen client regarding the removal consequences of a conviction."[2] *Id.* at 1487 (Alito, J., concurring). Under *Padilla,* counsel must advise the client of deportation consequences (1) "where the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequences of a conviction"; and (2) when the terms of the relevant immigration statute are not "succinct, clear, and explicit" regarding *removal*, counsel must advise the client that there may be a "risk of adverse immigration consequences" resulting

---

[2]The *Padilla* court refers to "removal" and "deportation" interchangeably.

6

from a conviction. *Id.* at 1483–84 (emphasis added).

Garcia argues that *Padilla* changed the law in the following ways:

> First, there is now no doubt that failure to inform a non-citizen client of immigration consequences violates the Sixth Amendment right to effective assistance of counsel and is a basis for vacation of the conviction. Second, the nature of the required advice depends upon the certainty of a particular consequence; where the specific consequence is clear and easily discernible by reference to statute, then the specific advice must be afforded, but where the results are uncertain, such as whether an immigration court will deem a particular offense to be a specific basis for removal or exclusion, the attorney need only advise the client of potential immigration consequences."

(Pet. at 10, Dkt. No. 14.) In other words, in the first instance, Garcia argues that if there are *any* immigration consequences as a result of a conviction, and those consequences are clearly and easily discernable by reference to statute, then defense counsel must advise her client of those consequences. In the second instance, Garcia argues that if *any* specific immigration consequence is uncertain from the terms of the statute, then defense counsel must advise her client that there is a general risk of adverse immigration consequences.

However, there is a key difference between what *Padilla* states and what Garcia argues. In regards to defense counsel's duty to advise when immigration consequences are clearly and easily discernable, Garcia asks the Court to broadly apply *Padilla* to *any* possible immigration consequence, as long as that consequence is clearly and easily discernible by reference to statute. Thus, when Garcia's federal public defender failed to advise him that his guilty plea carried with it permanent inadmissibility in the United States, Garcia argues that he received ineffective assistance of counsel because those consequences were clearly and easily discernable from the terms of 8 U.S.C. § 1182(a)(6)(C)(ii).[3] However, this Court finds that *Padilla's* holding is narrower in terms of the specific immigration consequences that defense counsel has a duty to disclose. After *Padilla*, defense counsel must advise a client of specific immigration consequences *only* when those consequences are

---

[3] 8 U.S.C. § 1182(a)(6)(C)(ii) states that "[a]ny alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any other Federal or State law is inadmissible."

7

deportation or removal, as opposed to *any* immigration consequences.[4]

In *Padilla*, the defendant faced deportation after pleading guilty to felony marijuana possession. *Padilla*, 130 S.Ct. at 1477. He petitioned the Court seeking, to vacate his conviction, claiming that his counsel failed to correctly advise him that pleading guilty "made his deportation virtually mandatory." *Id.* at 1478. Reasoning that deportation or removal are sometimes the gravest of penalties that can be connected to criminal convictions, the Court concluded that "counsel must inform her client whether his plea carries a risk of deportation." *Id.* at 1481–82. Highlighting the importance of being advised of deportation consequences, the Court stated that "the severity of deportation – the equivalent of banishment or exile – only underscores how critical it is for counsel to inform her noncitizen client that he faces a risk of deportation." *Id.* at 1486 (internal citation omitted).

Consequently, *Padilla's* analysis – its particular attention to removal – reflects its holding, that the Sixth Amendment requires defense counsel to advise her client of the *removal* consequences of a conviction. As such, *Padilla* did not change the law as applied to Garcia's case because it is clear from 8 U.S.C. § 1182(a)(6)(C)(ii) that his conviction did not carry with it the risk of removal. Therefore, Garcia's delay from 1997 to 2010 was unreasonable.

Even assuming that the delay from 1997 to 2010 was reasonable, the Court must still address the time from late 2010, when Garcia retained Shaiken, to 2012, when Garcia petitioned this Court. Garcia waited roughly 15 months to file his petition after learning that he could not obtain permanent residence status. (Garcia Decl. ¶ 9, Dkt. No. 14.) To justify this delay, Garcia argues that Shaiken needed time to prepare his case, which included interviewing Garcia and his old immigration attorney and obtaining Garcia's criminal and immigration files. However, Garcia has provided no cases that

---

[4]In regards to when the terms of the relevant statute are unclear, Garcia does not argue that his case applies to this scenario; however, the Court notes that his interpretation of defense counsel's duty is also too broad. Garcia argues that the duty applies to when *any* immigration consequence is unclear from the terms of the relevant statute, rather than specifically to when removal consequences are unclear from the terms of the relevant statute. This Court finds that the duty to advise of risks of adverse immigration consequences *only* arises if the terms of the relevant statute are unclear as to the *removal* consequences of a conviction. In other words, when it is unclear whether a defendant will be removed due to a conviction, counsel must advise that there could be a risk of removal.

8

have found that 15 months (or even less time) for case preparation was a valid justification for delay. The Ninth Circuit has found unreasonable both 20 and 9-month delays due to hardships during case preparation. *Riedl*, 496 F.4d at 1006-07. In *Riedl*, the petitioner argued that she could not prepare her case during the nine months after her release from prison because she was going through the process of being deported. *Id.* at 1007. She also argued that she could not file her petition for 20 months after being deported because she had trouble finding adequate counsel overseas. *Id.* The court found neither of the petitioner's reasons for delay compelling because she failed to explain why her deportation prevented her from preparing and filing in the first nine months, as well as what the actual hardships were that prevented her from finding adequate counsel sooner. *Id.*

Here, Garcia has provided no reasons why gathering two files and interviewing two people took 15 months. The Court recognizes that there are difficulties with litigation; however, assuring the Court that "the time was put to good use," does nothing to further Garcia's claims. (Reply at 3, Dkt. No. 20.) Further, Shaiken states that he is an expert in the area of immigration consequences of criminal convictions and most of his cases involve this area of law. (Shaiken Decl. ¶ 5, Dkt. No. 14.) Additionally, he states that he gives an annual lecture, has been qualified as an expert in court, and has edited a treatise – all on the subject of immigration consequences of criminal convictions. *Id.* Given Shaiken's claimed expertise, it is unclear why he would need such an extended amount of time to familiarize himself with a relatively simple case.

Indeed, the Ninth Circuit has found unreasonable a petitioner's delay where the defendant's newly retained counsel was experienced in immigration consequences of a conviction and did not file the defendant's writ as soon as possible. *United States v. Njai*, 312 Fed.Appx. 953, 954 (9th Cir. 2009). In *Njai*, the defendant claimed that his four-year delay in filing was due to retaining new counsel shortly after pleading guilty.[5] *Id.* Although the court did not articulate what the appropriate time would have been, it reasoned that the delay was unreasonable because the defendant's new counsel knew of the immigration consequences of the conviction from the *beginning* of his

---

[5]The petitioner also claimed that a change in the law justified the latter two years of his delay. However, the court was unsatisfied by this justification because the petitioner failed to provide any reason as to why it still took another two years to file once the Ninth Circuit changed the law. *Njai*, 312 Fed.Appx. at 954.

9

representation and "could have advised him to seek relief," but provided no reason why he did not. *Id.* The court found that the defendant's failure to expand on why retaining new counsel justified his delay was fatal to his case. *Id.* Similarly, given Shaiken's self-proclaimed expertise surrounding the immigration consequences of criminal convictions, Garcia has provided no valid reasons why Shaiken's recent retention justifies the 15-month delay.

Garcia also argues that his delay was justified because of the unsettled application of *Padilla* throughout federal circuits. (Reply at 3, Dkt. No. 20.) However, Garcia waited 15 months to file his petition when it has taken other petitioners weeks to file their petition under similar circumstances. *See, e.g., United States v. Hubenig*, 2010 WL 2650625, at *3 (E.D. Cal. July 1, 2010). In *Hubenig*, the court found that the defendant's delay was reasonable because he filed his petition within weeks of the *Padilla* decision. *Id, compare Njai*, 312 Fed.Appx. at 954, (holding as unreasonable a delay when the petitioner filed two years after the Ninth Circuit changed the law). Just as the defendant in *Njai* took two years once the law was changed, Garcia took 15 months to file his petition after *Padilla*. Consequently, as *Hubenig* and *Njai* show, Garcia's reliance on *Padilla* may have justified the delay between 1997 and 2010; however, Garcia has provided no authority that has found reasonable a delay similar in time to his own.

Finally, Garcia argues that even if his delay was unreasonable, the government must still show that the delay caused prejudice. (Reply at 3, Dkt. No. 20.) However, it is well settled that the government must prove prejudice *only* if they have alleged as much, which it does not do here. *Riedl*, 496 F.4d at 1008. In *Riedl*, the Ninth Circuit analyzed whether the doctrine of laches was part of the delay element of coram nobis relief.[6] *Id.* Finding that it was not, the court reasoned that "decisions have considered laches . . . only because the *government* invoked the doctrine as a supplemental defense." *Id.* at 1009 (emphasis in original). As the court explained, a respondent's need to prove

---

[6] Generally the doctrine of laches gives a respondent grounds for barring a petitioner from bringing a claim because a substantial delay in bringing that claim caused undue hardship or prejudice to the respondent. *Wells v. U.S. Steel & Carnegie Pension Fund, Inc.*, 950 F.2d 1244, 1250 (6th Cir. 1991).

10

prejudice is not part of the delay prong of coram nobis and will only arise if the government alleges prejudice. *Id.* The court concluded that "the proper standard by which the existence of 'sound reasons' should be measured is [not] that of [prejudice] . . . . The critical inquiry . . . is whether the petitioner is able to show justifiable reasons for delay." *Id.* (internal quotations omitted). In this case, the Government has neither formally claimed that laches applies, nor that the delay caused any form of prejudice. As a result, the burden is on Garcia alone to justify his delay and he has not met his burden.

Based on this analysis, the Court finds that Garcia has failed to provide valid reasons for his delay because *Padilla* did not change the law as applied to his case, Garcia has failed to give any valid reason why Shaiken needed 15 months to prepare his case, and the Government need not prove prejudice. Therefore, Garcia's delay in filing his petition for writ of error coram nobis is unreasonable.

**B.      Whether Garcia has Demonstrated a Fundamental Error in His 1997 Guilty Plea**

As to the fundamental error element, Garcia argues that his Sixth Amendment right to counsel was violated when Fox, his public defender, failed to inform him of the adverse immigration consequences of his guilty plea. (Pet. at 1, Dkt. No. 14.) Specifically, Garcia contends that *Padilla* required Fox to inform him of the adverse immigration consequences of his conviction before pleading guilty because those consequences were clearly and easily discernable from 8 U.S.C. § 1182(a)(6)(C)(ii). *Id.* at 10. Further, Garcia contends that he has been prejudiced because being inadmissible due to his conviction was the worst possible result for him and, had he known of that consequence, he either would have attempted to negotiate a more favorable plea deal or he would have insisted on going to trial, which would have given him the opportunity to present an affirmative defense to his charges. (Garcia Decl. ¶ 13, Dkt. No. 14.)

In response, the Government argues that Garcia has no claim of ineffective assistance of counsel because *Padilla* does not apply retroactively. (Opp'n, at 5, Dkt. No. 19.) Further, the Government contends that in 1997, the objective standard of reasonable assistance of counsel did not include informing a defendant of adverse immigration consequences; as such, Fox's failure to inform

11

Garcia of those consequences was not ineffective assistance. *Id.* at 10. Finally, the Government argues that even if Fox should have informed Garcia of his immigration consequences, he has suffered no prejudice due to Fox's failure. *Id.* at 11. Specifically, the Government reasons that the overwhelming evidence of Garcia's guilt coupled with the favorable plea deal that dropped the charged felony down to a misdemeanor makes it unreasonable that he would have insisted on going to trial had he known of the immigration consequences of his conviction. *Id.* at 11-12.

To prove fundamental error, Garcia must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, Garcia must first prove that Fox's representation "fell below an objective standard of reasonableness," meaning that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms."[7] *Id.* at 688. In articulating *Strickland's* objective standard, the Court in *Padilla* held that prevailing professional norms require defense counsel to "inform her client whether his plea carries a risk of deportation." *Padilla* 130 S.Ct. at 1486. Second, Garcia must prove that Fox's failure to inform him of the immigration consequences of his conviction caused him prejudice. "In the context of a plea, a petitioner satisfies the prejudice prong of the *Strickland* test where there is a reasonable probability that, but for counsel's errors, he would have not have pleaded guilty and would have insisted on going to trial." *Smith v. Mahoney*, 596 F.3d 1133, 1141 (9th Cir. 2010) (internal quotation and citation omitted). In other words, "a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla* 130 S.Ct. at 1485.

1. Whether Fox's Representation Fell Below An Objective Standard of Reasonableness

Here, as to the first *Strickland* prong, Garcia argues that Fox fell below an objective standard of reasonableness when she failed to advise him of the immigration consequences of his conviction because those consequences were clearly and easily discernable from a reading of 8 U.S.C. § 1182(a)(6)(C)(ii). However, as discussed above, *Padilla's* holding does not apply to this case because it is clear from a reading of § 1182(a)(6)(C)(ii) that Garcia was not deportable as a result of

---

[7] The standard of professional norms can be found from different sources, such as the "American Bar Association, criminal defense and public defender organizations, authoritative treatises, and state and city bar publications." *Padilla*, 130 S.Ct. at 1482.

12

his guilty plea. Instead, as a result of pleading guilty, Garcia was deemed inadmissible within § 1182.[8] As the Court in *Padilla* noted, "[i]t is quintessentially the duty of counsel to provide her client with available advice about an issue like deportation and the failure to do so 'clearly satisfies the first prong of the *Strickland* analysis." *Id.* at 1484. As a result, Fox did not fall below any objective standard of reasonableness because she did not have a duty to inform Garcia of the immigration consequences of his conviction.

### 2. Whether Garcia Suffered Prejudice as a Result of Fox's Representation

Even if Garcia was able to satisfy the first *Strickland* prong, the Court must still determine whether he suffered prejudice as a result of Fox's representation. Garcia argues that he was prejudiced because, had he known of the immigration consequences of his conviction, he would have either negotiated a better plea deal or insisted on going to trial. (Garcia Decl. ¶ 13, Dkt. No. 14.) Garcia's claims must be weighed against the circumstances surrounding his guilty plea. *Padilla*, 130 S.Ct. at 1485. In making this determination, courts look to two factors: (1) the amount of inculpatory information against the defendant weighed against any rational defense, and (2) the benefit received by pleading guilty. *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012) (considering both factors in determining prejudice); *Haddad v. United States*, 2012 WL 2478355, at *5 (6th Cir. June 28, 2012) (same); *Hubenig,* 2010 WL 2650625, at *9 (relying on the benefit received in determining prejudice).

In *Pilla*, the petitioner claimed that she received ineffective assistance of counsel because she pled guilty to violating 18 U.S.C. § 1001 – making false statements to the FBI – without being informed of the deportation consequences of her conviction. *Pilla*, 668 F.3d at 371. In holding that the petitioner failed to establish prejudice, the court first found that "the overwhelming evidence of guilt," "which included a video that showed her planting the letters, a CD of incriminating phone conversations, and FBI interview notes documenting her confession," left her with "no rational defense." *Id.* at 373. As the petitioner faced five years in prison and pleaded down to a sentence of six months, the court found that the only consequence of the defendant not going to trial "is that she got a shorter prison term than otherwise." *Id.* The court also noted that the petitioner could not

---
[8] "[A]liens who are inadmissible . . . are ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182.

13

"make a showing merely by telling us now that she would have gone to trial then if she had gotten different advice." *Id.* Relying on the above factors, the court held that "no rational defendant in [the defendant's] position would have proceeded to trial . . . ." *Id.*

In *Haddad*, the petitioner claimed that his attorney did not advise him of the immigration consequences before pleading guilty to possessing a controlled substance (LSD). *Haddad*, 2012 WL 2478355, at *1. In addressing the two factors, the court found that the petitioner was not prejudiced because no rational person in the defendant's position would have proceeded to trial. *Id.* at *5 (citation omitted). Following *Pilla*, the court found that the "evidence against [the petitioner] was strong" because he was caught "red handed" while being searched by a United States Customs agent. *Id.* at *4. Weighing the evidence against the petitioner's claimed defenses – mainly an illegal search or seizure – the court found that the petitioner had no rational defense because he failed to offer any reason why those defenses would be successful at trial. *Id.* Addressing the benefit the petitioner received by pleading guilty, the court found that the benefit "tipped the scale in favor of [] pleading guilty" because he was sentenced to pay a fine of $1,000 when he "faced imprisonment for up to one year or a higher fine, or both." *Id.* at *5.

In *Hubenig,* the petitioner pled guilty to three violations: "excessive speed, failure to comply with a traffic control device, and possession of a controlled substance," and was sentenced to 12 months unsupervised probation; however, had he proceeded to trial, he faced a maximum penalty of 6 months in prison. *Hubenig,* 2010 WL 2650625, at *9. Relying on the second factor, the court found that the petitioner "did not receive such a good bargain as a result of his plea that it would have been unreasonable for him to forgo the plea and proceed to trial." *Id.* The court reasoned that "the agreed-upon sentence . . . [was] not particularly favorable when measured against a typical sentence for the types of crimes with which he was charged."[9] *Id.* Finally, the court held that given the largely unfavorable plea deal, the petitioner was prejudiced because it would have been reasonable to reject his plea deal and take his chances at trial had he known of the deportation consequences of his

---

[9] While the court did not explain what a typical sentence for those types of crimes would be, the court did explain that it was "very unlikely . . . that the statutory maximum penalty might be imposed." *Id.*

14

conviction. *Id.*

Here, as to the first factor, the allegations against Garcia were vast, including a California Driver's License containing a picture of Garcia bearing the name "Gabriel Leiba Mendez," a photograph of Garcia on the passport application, verification from the State Department that there was no birth record matching the "Gabriel Leiba Mendez" on the submitted birth certificate, and numerous admissions as to his true identity upon being arrested at the San Francisco Passport Agency. (Vancio Aff. ¶¶ 5-7, Dkt. No. 1.) To combat this evidence, Garcia points to the "Bureau of Diplomatic Security Unclassified Report on the case" as evidence of an involuntary admission. (Pet. at 4, Dkt. No. 14.) However, Garcia provides no citation, documents, or excerpts from the report that would validate this claim. *Id.* Just as the *Haddad* court relied on the petitioner's failure to support his claimed defenses, Garcia's failure to substantiate his claimed defense leads the Court to find that "the overwhelming evidence of guilt" against him outweighs any likelihood of succeeding at trial. Finally, the circumstances in *Pilla* are nearly identical to those in the present case, and just as the court noted in *Pilla*, Garcia cannot make a showing merely by telling the Court that he would have gone to trial then if he had received different advice. Therefore, even if Fox would have informed Garcia of the immigration consequences of pleading guilty, no rational defendant in Garcia's position would have proceeded to trial because of the overwhelming evidence of guilt against Garcia.

As to the second factor, Garcia was initially charged with a felony violation of 18 U.S.C. § 1542 – False statements in application for a passport. (Pet'n. at 4, Dkt. No. 14.) If convicted under § 1542, Garcia would have faced a possible penalty of ten years imprisonment and a $250,000 fine. 18 U.S.C. §§ 1542, 3571. Facing felony charges, Garcia plead down to a misdemeanor and was sentenced to one year probation and a $25 fine. (Opp'n. at 12, Dkt. No. 19.) Compared to *Haddad* and *Pilla*, Garcia avoided significantly larger penalties when he pleaded guilty, and just as the courts in *Haddad* and *Pilla* found that the penalties avoided were noteworthy benefits of foregoing trial, the Court finds that the benefit Garcia received "tip[s] the scale in favor of pleading guilty." *Haddad*, 2012 WL 2478355, at *5. Additionally, unlike *Hubenig*, where the petitioner was both charged and pled to a misdemeanor, Garcia avoided a felony conviction through his plea deal. Further, had

*Hubenig* decided to forego a guilty plea and proceed to trial, he faced a maximum of 6 months in prison, while Garcia faced 10 years in prison had he decided to go to trial. The Court finds that Garcia's result was not "largely unfavorable," but largely favorable because he served one year of probation instead of a decade in prison. *Hubenig,* 2010 WL 2650625, at *9. Moreover, if Garcia would have gone to trial, he would have faced a violation of § 1542, which is a deportable offense. *See United States v. Stubbs*, 2011 WL 3566839, at *1 (M.D. Fla. Aug. 15, 2011) (finding that § 1542 is a deportable offense). This makes Garcia's guilty plea more beneficial because he actually avoided deportation when he avoided trial. Due to the benefits Garcia received by pleading guilty, it would have been unreasonable for a defendant in Garcia's position to reject the plea and proceed to trial.

Given this analysis, the Court finds that Garcia has failed to show that Fox's representation fell below an objective standard of reasonableness or that he was prejudiced due to this representation. As a result, he has failed to demonstrate fundamental error in his 1997 guilty plea.

## C. Petitioner's Request for Abeyance

In his reply brief in support of his Petition for Writ of Error Coram Nobis, Garcia requests that the Court, even if inclined to deny his petition, hold any decision in abeyance until the Supreme Court decides the issue of retroactivity in *Chaidez v. United States*, 655 F.3d 684, 694 (7th Cir. 2011), *cert. granted* 80 U.S.L.W. 3429 U.S. April 30, 2012. No. 11-820. The Government makes the same request. However, both request that the decision be held in abeyance only if the Court decides against them. Garcia asks that any decision be held in abeyance if the Court is inclined to deny his petition, (Pet'r Reply at 5, Dkt. No. 20,) while the Government asks that any decision be held in abeyance if the Court is inclined to grant Garcia's petition (Opp'n at 3, 4, Dkt. No. 22). However, as discussed above, even if the Court were to find that *Padilla* is retroactive, Garcia has still failed to satisfy the elements for coram nobis under such an analysis. Thus, there is no reason for the Court to hold its decision in abeyance.

*///*

*///*

*///*

16

## V. CONCLUSION

For the foregoing reasons, Mr. Garcia's Petition for Writ of Error Coram Nobis is DENIED.

**IT IS SO ORDERED.**

Dated: November 7, 2016

_____
Maria-Elena James
Chief United States Magistrate Judge

17